I should have brought a stool. Sorry if I look like just a hat above a podium. Yes, one of my indulgences to being a little older is I quit wearing heels, but it doesn't help me in situations like this. Good morning, your honors. My name is Leslie Arrett, and I represent the City of Harahan in this matter. This is a situation where the district court created a new giglio liberty interest due process claim under Section 1983 against police departments and other law enforcement agencies. That decision should be reversed for multiple reasons. Now, as you know, 1983 is not a don't-do statute. It's a don't-do-it-without-due-process statute. What would the due process be in this circumstance? What would it look like? In this scheme, the due process that Mr. Adams wanted, Captain Adams wanted, was to have his civil service board appeal. We know that the civil service board under U.S. Supreme Court Brady, Giglio, Kiles, this long line of Supreme Court cases, the civil service board's decision can't supplant what the prosecutor decides should be and shouldn't be on the Brady Giglio. Yes. Let me ask you about your complaint. You're seeking damages, correct? I'm the defendant. I'm not. About the complaint. Damages are being sought. Yes, sir. So there's no effort in this case to remove the impediment to his career, if that's what it really is. Correct? There's no effort to seek adjunctive declaratory relief. No, sir. That should disappear from his record. That's exactly right, Your Honor. And in fact, in this case, as you know from the record, Captain Adams was given due process. He was given both a lottermill pre-determination, pre-deprivation hearing, and he was also given a post-deprivation hearing. He chose to settle that, and he chose to resign his employment from the City of Harahan. So in fact, he chose his own fate in terms of a liberty interest. He could still be working for the City of Harahan right now, but he is not because he chose to settle. Now, your brief seems to accept that there is a liberty interest to the employment. Does it? Well, I think there's a liberty interest in employment, but in this case, we're not talking just about a liberty interest. We're talking about . . . because as I said, there's a . . . do you have . . . is there a liberty interest, and is there due process? You need both, it seems to me. Right. You would need . . . If you are . . . I don't want to use the word you're immediately conceding. You are accepting that he has shown in this case a liberty interest in the continuation of his job as a policeman, and that, I'm not sure if I'm there yet. Well, I'm not conceding it because he chose to give that up. I mean, he settled with the department and he resigned. In fact, he had no adverse employment action at all. However, even if you get past that, you have to still show that you're entitled to some due process, and unfortunately and fortunately for criminal defendants, Brady, Giglio, Kyles, all say that, you know what, that discretion is in the prosecutor's hands, solely the prosecutor. The prosecutor knows what's relevant, what's not relevant. Just as a matter of fact, the Harahan Police Department did nothing but send a determination, an investigative report to the prosecutor. Didn't say anything in a cover letter like, folks, you should put this guy on the Giglio list. Folks, you should do something bad with this guy. No. All it did is forward it, and in fact, you know what it forwarded with that? It forwarded the letter to Mr. Adams, Captain Adams, saying he had the right to appeal, which they could, the prosecutor could easily find out he did. So that's not the issue. The police department did nothing but discharge what they are required under Brady and Giglio line of cases to do, and in fact, what the Jefferson Parish Police Department said, you must do. You must do immediately. You must not, you know, think what should and couldn't happen, and what due process might happen. You have to send it to us, because guess what? It's our decision, the prosecutor, to determine what to do with it from there. Now, the district court also based its ruling on some flawed legal conclusions. It accepted two factual allegations as true legal conclusions, and in fact, as we know under the Supreme Court Twombly case, courts aren't bound to accept as true legal conclusions couched as factual allegations. One of the first of those that's really important is that the district court found that once someone gets on a Giglio list, they never get off, but there's no case law to support that. In fact, again, it's prosecutorial discretion, and in fact, I have a case that I will give you the site for. It's Lane v. Marion County District Attorney's Office, 310 Oregon Appellate Court, 296, it's a 2021 case, in which, you know, in that case, there was a big hoo-ha, the claim was about the district attorney deciding whether or not to take someone off the list. So that's just a false legal conclusion that once someone gets on the list, they can't get off the list. The other premise that was accepted as true, and which Mr. Adams said repeatedly in his complaint, was that the Giglio decision was somehow in the hands of the police department, but in fact, that's absolutely not true. The police department doesn't make Giglio decisions, doesn't keep a Giglio list, doesn't publish a Giglio list, doesn't Giglio impair officers, doesn't decide who remains or goes off the list, and that's a matter of well-settled Supreme Court law under Brady and Giglio and Kiles. In the Kiles case, the court said the prosecutor is responsible to disclose even what's known only to police, and that was what the Kiles case stood for, was that the prosecutor had to disclose what it might not know, but a police department would know, and that's why prosecutors then put the onus on police departments, turn over everything to us. Turn over everything, and we're going to decide. So under Kiles, the U.S. Supreme Court made clear it was the Harahan Police Department's obligation as a police department to provide potential Brady and Giglio information to the prosecutor as an integral part of the judicial phase of the Brady-Giglio decision-making process. Now, there's another very important case that we've cited in our briefing, Roe v. Lynch. It's a First Circuit Appellate Court, 2021. On the court-affirmed dismissal of a liberty interest due process claim, saying the plaintiff cannot have a protected interest in something that government officials can grant or deny in their discretion, and discouraging broad discretion is contrary to the U.S. Supreme Court's recognition that a prudent prosecutor should err in favor of disclosure of Brady or Giglio information and so . There's a missing no commentary whatsoever. The prosecutor then decides what to do with it from there. And guess what, by the way, we don't know, there's no allegation at all in this complaint that either the Harrahan police department or the prosecutor did anything with it. There's just an assumption here. Once you get on the brady list, the giggly list, you never get off and it hurts your right. But there's nothing in the complaint that says it leapt off the page and went anywhere. And there's no allegation that it did cause that damage. So I think that's an important aspect as well. Now another issue is that a deprivation of liberty interest claim requires the deprivation and the resulting harm to derive from the same source. And that's also in the Roe v. Lynch case. So it's under Fifth Circuit law, the Fifth Circuit uses the stigma plus analysis to determine it applies the stigma plus test when a plaintiff brings a liberty interest claim alleging reputational harm by the government. And the district court mysteriously dismissed the stigma plus claim, which the Fifth Circuit did the exact same analysis but didn't dismiss this claim. But it has to be dismissed because under the stigma plus line of cases, you have to have the same actor cause the stigma as cause the plus. I mean it can't be two separate governmental actors. So that's under the Roe v. Lynch case. There's also the Espinoza v. Whitaker case. It's a Ninth Circuit case. It's in our briefing, Your Honors, Ninth Circuit 2019 case. In that case, the prosecutor is the one who released this information about the officer and sent it to the employer who was the Department of Homeland Security. And the court found no stigma plus. There was no claim there because even though both were governmental entities, they were not done by the same entity. The stigma is the public disclosure by the prosecutor of the Giglio impairment and the plus was the employer, the Department of Homeland Security, firing this officer and the court said there's no claim there because it's not perpetrated by the same governmental actor. So Adams says the issue presented is whether a police department is given license by Brady and Giglio to publish unsubstantiated allegations to a district attorney, thereby destroying civil service employees' liberty interests. Well, the first problem there is there's no publication. Second of all, the police department doesn't publish anything and there's no allegation that it did. The only allegation is that there was a transmittal email and documents from the police department to the prosecutor and by the way, the case law, in fact, in this particular case, Captain Adams requested, did a public records information request to the department, I mean, sorry, to the prosecutor asking for their Brady and Giglio list and the prosecutor said, uh-uh, we're not giving it to you because it's work product. So where's the publication there? It's difficult to see. As we've noted and Judge Stewart mentioned, there's a link in the causation chain here because there's nothing that the Harahan Police Department did that it shouldn't have done,  and finally, you know, this cause of action that was created by the district court is completely unrecognized. There's absolutely no court, none were cited in the United States in which a so-called pre-Giglio due process requirement would be required. Now see, I'm out of time. Thank you, Your Honors. Thank you. You have your rebuttal. All right. Here's for Mr. Adams. Okay. Thank you. I have a question for Deputy Clerk. Is this the courtroom the afternoon sitting is in? Yes. I see some new guests. I was wondering. All right. Good morning, Your Honors. My name is Brandon Venegas. May it please the Court, I represent Captain Adams.      It was a request to the Harahan Police Department. to investigate a case involving a person who had communicated a plan and policy to circumvent the Civil Service post-deprivation due process hearing and findings of the Civil Service Board by communicating his unadjudicated findings on investigations that he himself created. In other words, he was creating the discipline. And, you know, my colleague had mentioned settle. Well, we didn't settle. We didn't settle the particular case where the Giglio was sent, okay? There were two more investigations, so let me just kind of correct that, and ultimately he said, you know what? I'm done with this. I'm done with Harahan, but I'm not done with being a police officer. And ultimately, we alleged and we showed in both complaints that circumventing and neutering the due process provided by the Civil Service and any results of that independent tribunal's decision and findings was the purpose of the rush to declare my client untruthful to the district attorney's office with allegations created by the police chief. And look, I'm telling you, they had conversations. If you look at the complaint on pages 23 onwards, the chief of police and his subordinate knew that once an allegation of truthfulness was communicated to the district attorney that it couldn't be removed. The police chief was in such a rush to end careers that he mistook the, I suspect that they mistook the initial check lottermill hearing as if this was a real hearing. And I believe that he mistook, the lottermill created a pre-disciplinary hearing as before. That lottermill, the way it was structured, because it's employment, you don't want to have somebody that might be a bad employee hanging about. So what lottermill does is it creates an initial check and that initial check is for people that are in good faith. For instance, in the Cleveland v. Board of Lottermill, the guy, the person that was disciplined, they had his name wrong and they fired him without giving him the hearing. But the lottermill hearing rests on the fact that there's a post-deprivation hearing. The lottermill decision states, our holding rests in part on the provisions in Ohio law for a full post-termination hearing. We can, in further says, we conclude that all process that is due is provided by a pre-termination opportunity to respond, coupled with the post-termination administrative procedures as provided by the Ohio statute. And as I mentioned, we showed in the complaints that the police chief knew the consequences of his communications, of his unadjudicated and predetermined findings would be the client would be permanently on the Giglio list. And what they're seeking is a rule that you can do whatever you want if you're a police. And as long as you say it's Giglio communication, then that's going to be okay. They're seeking to give themselves essentially the prosecutorial absolute immunity. And that's not the case here. You can't communicate allegations that you were a part of, that you designed in order to put somebody on the Giglio list. And if you look at the complaint, one of the most, one of the things that they did is in the complaint, let me cite it here. We show in the complaint, to add insult to injury, the complaint shows that Chief Walker actually opened an investigation of plaintiff for being on the Giglio list with a view of terminating. And that was in the record pages 30 and 31, and it was attached as Exhibit 9, which is Record of Appeal 114 and 115. So basically while he was waiting to have his post-termination civil service hearing, they investigated him for being on the Giglio list. Do you want to know why he was on the Giglio list? Because Chief Walker, and they had a policy to put him on the Giglio list. What we're, what we're trying to prevent is having, you know . . . Assuming your arguments about how things transpired and why are there, I mean, what's the case law to support the determination by the district court below with respect to the constitutional right? Well, the fact, what we did for the appellate brief is we restated Loudermilk to explain the process in the employment context. But the case that we cited was Baumgarner. And what happened in Baumgarner is the person that may had, he had an appeal right, and he wasn't able to get the remedy. And, you know, much was made in the brief about the remedy. We won. They violated the police officer's bill of rights. And that remedy is that any adverse action, and that's read broadly, is null and void. Well, the adverse action that was sent by Chief Walker, all he had to do was wait. He decided to send his unadjudicated findings to the district attorney for purposes of removing people later for having Giglio violations. I mean, there are several assumptions here, and there may well be evidence about the ill will of the police chief, but among the assumptions is that once your client's name is on that list, it can't be removed. What is that other than an assumption? What do we know about it? We know because at the civil service hearing, in the brief we cited on pages, in my, I think it's on, in the complaint page, Record of Appeal 25 and 29, there was a, he had a pattern in practice. He, Captain Adams wasn't the first person that he did this to. He did it to three other officers, and Officer Darwin, he had, he had disciplined him, and he also sent the Giglio list. And on September 26, 2019, the civil service meeting, the agenda that was attached to that civil service meeting was trying to get him off the Giglio list. Later, after they sent the, sent the communication to the district attorney in October, I think it was October 19th, 2019, and November 13th, 2019, there was another civil service meeting, and he admitted that he couldn't remove him from the Giglio, that the DA would not remove him from the Giglio list. The civil service . . . It may well be a right to have your name removed, I don't know one way or another. All you know now is, it seems to me, the civil service commission or the police, or the district attorney is not willing to remove, but I wonder if that is actually what the law is, and you haven't tested it, it seems to me. Well, I mean, look at it from their point of view. They have duties on the Brady, okay, and look, before, let me, I want to answer your question, but . . . What I'm talking about is what the law is. You may give me some sort of prudential reasons, but if there really isn't any law on it, I'm not terribly concerned about looking at it from their viewpoint. Well, I think from a risk-adverse situation, they don't want to go ahead and . . . there's no law, as far as I can tell, but from a risk-adverse, they don't have a duty to my client. They collect the information, they put them on the list. I spoke with the person, I mean, it's not in the record, but I did speak with the district attorney, but at the same time, it does seem kind of wrong to me that this particular chief of police had a plan in practice, had done it to three other officers prior, in order to have discipline, in order to send communications. Every single one of those communications, I believe, I have to check that, but at least one of the other ones I know, declared that these people were untruthful, and the purpose of doing that . . . You're making a passionate argument, which is understandable, on behalf of your client, but you're not helping us in terms of, you know, what the legal basis for all this is. We're not going to unpack whether what you say . . . Well . . . Listen. We're not going to unpack whether what you say is true or not, in terms of why people did, and so on and so forth, and that's pretty much what you're giving us. Now, you say in the brief, my client, quote, won, which meant, from first reading, a vindication of all this you said. But as I understand it, correct me if I'm wrong, the Civil Service never made a determination about any of that, because that's when the settlement occurred, and all of that ended. Is that correct or not? No, that's not correct. All right. What happened was, is we had multiple day hearings . . . Did the Civil Service make a determination vis-à-vis the allegations that you're claiming? They made a determination that they had violated his police officer's Bill of Rights to Minimum Standards, and as such, the determination and the decision of Civil Service Board was null and void. In terms of settling things, that had to do . . . there were two other investigations of my client, and at that point, once we had shown what was going on within . . . he accepted the first decision, which was the discipline that they had communicated the giglio information to the district attorney. That was a motion from Captain LaSargent. Are you saying that was overturned by the Civil Service? Yes, it was. Yes. All right. Yes. So the . . . I guess what concerns me, and this is unorthodox, there are a lot of new laws made, all the new decisions all the time, that the circuit may be getting known for that. It seems to me the real action here would be to test this assumption that your client's name cannot be taken off the list by suing the district attorney, and he said it can't be done. Well, the . . . And off you go and say if I've been . . . you haven't been vindicated necessarily, but if whatever the underlying allegations are that got your client on that list are shown not to be true, then they owe me a right to have that dishonor removed from your client's record. This is not the case to determine that, and that seems to be the injury. Well, the cause that put us on the list is what we would allege is the defamatory statement. The allegations were essentially, as the Civil Service Board ruled, null and void. So to me, sending out . . . they took their chances when they sent it out. Is it defamatory? It wouldn't publicize. Well, it was . . . The publicity of it, which is perfectly understandable, but the publicity of it, I guess, arose from this litigation, not from the action of the police chief sending this to the DA. Well, the purpose was to publish it to the DA in order to put us on the gig list, essentially put the client on the gig list. Well, for the DA to know it, but not to publicize it, so I'm not sure it's . . . I'm just wondering about your calling it . . . Well, look, we don't want to work at Harahan anymore, but it doesn't mean we don't want to be a police officer. Whenever you fill out an application, you have to tell people that you're on the gig list. And that's why getting your client's name off the list seems to be the necessary goal, not this litigation. Well . . . I mean, work with me. I'm . . . No, I . . . I'm thinking poorly out loud, so help me with this. No, I understand, but at the same time, they have the problem of absolute immunity, and so decisions that the DA decides to make is not subject to litigation. It's . . . Well, prosecutorial immunity from damages maybe, but not from correcting some record if it needs to be corrected. Well, if they put us on the gig list, they communicated what ultimately ended up being an untrue statement, then why should it be our burden? Maybe the city of Harahan should interplead the district attorney in order to mitigate their damage. But at the same time, the harm that was caused was caused by the city of Harahan. These communications are not blanketly protected. There is a divide between, in the judicial phase, decisions by the district attorney to not call witnesses, but there's cases that we cited, Crow v. Lawyer, they cited a case with Roe v. Lynch. One of the most important things that I thought about Roe v. Lynch was Judge Justice Lippis said that his concern in this particular case was that there were no allegations about the employer. He said if there had been allegations against the employer for trying to communicate to the district attorney's office, to put them on the giglio list, then the result of that case finding absolute immunity or prosecutorial immunity could very well be reversed. I would have a look at the concurrence in that particular case because that's the concern is that you're going to have . . . we have a civil service system and that civil service system is meant to protect against favoritism and so forth. If you can go ahead and send discipline out . and .      Just a few points about the way I wrote on the issues. He went through the civil service hearing and he got a nullity and got reinstated to his job. He chose not to do it, chose to take a resignation, but he did not . . . that is the due process, he did not get what he wanted. He needs to do something, I suppose, with the district attorney's office. He hasn't requested that his name be removed. We don't even know if his name is on a list, but again, I think as you all pointed out is that there's not . . . there's no publication here. There is legislation, as we pointed out in our briefing, in some states that have . . . for example, police officer . . . police departments and other law enforcement officials can't make decisions based on whether or not someone's on the Giglio list, or that prosecutors have to do certain things before putting someone on the Giglio list, but the focus is certainly not on don't send that information to the DA. Of course, this lawsuit, it seems to me, is about the plaintiff saying the police chief vindictive, may not be the right word, but improperly made these conclusions about his client, and made the determination and off it goes, and so the real misconduct was by the police chief, if I understand it, under the allegations to carry this out, and to discipline, and to demote him, and to send the list, so he wants to challenge that. He's not going to try to fix in this lawsuit getting off the Giglio list, but he's trying to get damages from the city, from this municipal decision maker, the police chief, who is the highest ranking person in law enforcement in the city, and so would have policymaking, so in that way, it's a 1983 suit against the police chief, but I must say, it's not the usual kind of lawsuit, but unless, he's trying to fit it into that mold. Right, he's trying to fit it into that mold, and he can't do that. His remedy was in the civil service hearing, and to get reinstated to the police department. He chose not to do that. That's certainly his right to do. He could have challenged any disciplinary decisions with the civil service board. He chose not to do that, but just because there's not a remedy in this circumstance for what he wants, doesn't mean that we have to create one, and that was the fault of the district court citing Baumgardner, which really only stood for the . . . I mean, it's not a Giglio case. It has nothing to do with due process, liberty interest due process. It's really just along the lines of, if you don't have a cause of action, should you have one, and there are lots of things that there aren't causes of action for if you don't meet the elements. Title VII, if you don't have a comparator of a similarly situated person treated differently and like circumstances, you're not going to have a cause of action. That doesn't mean the court should create the cause of action, and that's the problem here that Mr. Venegas is asking, is to create something that doesn't exist, but it's clear, and I love the Cunningham case that was cited in our brief. The question was whether or not the plaintiff can state a stigma plus claim that he has to prove, among other things, he was discharged. Mr. Adams wasn't discharged. Stigmatizing charges were made against him in connection with his discharge, and those charges were made public. That didn't happen. He requested but was denied a hearing to clear his name, but Adams doesn't allege any of these things. He doesn't allege and cannot allege he was discharged. He voluntarily retired. He does not and cannot allege the police department made the inclusion on the Giglio list, if he's even on it, public. That never happened. He does not and cannot allege he requested and was denied a name clearing hearing. Those are all of the reasons why under the Cunningham case and all the Fifth Circuit cases on stigma plus, meaning that he doesn't have a cause of action here. Thank you for your time today. All right. Thank you, counsel. Thank you, counsel, both for the briefing and the case. It's an interesting case, to put it mildly, but we'll do our best with it. This concludes the orally argued cases for this panel. We will stand and recess until 9 a.m. in the morning.